# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| GREGORY TAUREN JACKSON | § | |
| | § | |
| V. | § | CASE NO. 1:17-CV-1098-AWA |
| | § | |
| CITY OF AUSTIN, ET AL. | § | |

## ORDER

Before the Court are Defendants Jones and Huckaby's Motion for Summary Judgment (Dkt. No. 48); Plaintiff's Response (Dkt. No. 55); Defendants' Reply (Dkt. No. 56); Defendant City of Austin's Motion for Summary Judgment (Dkt. No. 49); and Jackson's Response (Dkt. No. 55).

## I. BACKGROUND

Gregory Tauren Jackson brought this suit against the City of Austin and Austin Police Officers Jason Jones and Brian Huckaby, alleging unlawful arrest and excessive use of force under 42 U.S.C. § 1983, and a number of accompanying state law claims. In his responses to the summary judgment motions, Jackson has abandoned his claims against the City,[1] and narrowed his claims against the officers.[2] The suit arises out of an incident that occurred in the early morning hours of December 20, 2015, which ended in Jackson's arrest on Austin's "infamous" Sixth Street. Though he was charged that night with failing to follow a lawful order and resisting arrest, those charges were subsequently dismissed, and Jackson later brought this lawsuit.

---

[1]*See* Dkt. No. 55 at 24-25.

[2]Specifically, Jackson dropped his § 1983 claim that the officers were recklessly indifferent to his serious medical needs, as well as "his claims of unreasonable search and seizure, deprivation of liberty, false arrest/false imprisonment, and assault claims . . . under state law and common law theories." *Id.* at 25.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Trent v Wade*, 776 F.3d 368, 376 (5th Cir. 2015). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputed fact issues which are "irrelevant and unnecessary" do not preclude the entry of summary judgment. *Id.* at 248. Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence of the existence of a genuine fact issue. *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). On the other hand, conclusory allegations, unsubstantiated assertions, or unsupported speculation are not competent summary judgment evidence, and are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v.*

*Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment is proper. *Celotex*, 477 U.S. at 322-23. However, courts may not grant summary judgment, even where it is unopposed, if the movant has not discharged its burden under Rule 56. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981).

### III. FACTS

On the night in question, at around 2:30 a.m., Jackson was crossing Sixth Street with his girlfriend and others after leaving a bar. Dkt. No. 55-6 at 30. He was crossing mid-block from the south side of the street, headed to the north sidewalk. Dkt. No. 55-1 at 47-48. As he crossed the street, he encountered the APD street-clearing parade. *Id.* Jackson was attempting to cross between the mounted patrol and the officers on bicycles when he bumped into Officer Jones's bicycle. *Id.* Jackson's girlfriend and the rest of his party had already made it across to the north side of the street, and Jackson was attempting to join them. Jones, however, instructed Jackson to return to the sidewalk on the south side of the street. *Id.* at 49-50.

The following facts come from the summary judgment record and are set forth in the light most favorable to the plaintiff. On Saturday, December 19, 2015, continuing into the early morning hours of Sunday, December 20, 2015, Gregory Tauren Jackson visited Sixth Street with his girlfriend and others. Dkt. No. 55-6 at 30. On weekends, a number of blocks of Sixth Street are closed to traffic, and the entire street is a pedestrian zone. At the end of such nights, the Austin Police Department follows a process to clear the street of pedestrians before it is re-opened to vehicular traffic. The process involves a "parade" of sorts involving mounted police, bicycle officers, and patrol cars, moving slowly down the street, instructing pedestrians to exit the street and move onto the sidewalks. Dkt. No. 55-1 at 45. On the night in question, at around 2:30 a.m., Jackson was crossing Sixth Street with his girlfriend and others after leaving a bar. Dkt. No. 55-6 at 30. He was crossing mid-block from the south side of the street, headed to the north sidewalk. Dkt. No. 55-1 at 47-48. As he crossed the street, he encountered the APD street-clearing parade. *Id.* Jackson was attempting to cross between the mounted patrol and the officers on bicycles when he bumped into Officer Jones's bicycle. *Id.* Jackson's girlfriend and the rest of his party had already made it across to the north side of the street, and Jackson was attempting to join them. Jones, however, instructed Jackson to return to the sidewalk on the south side of the street. *Id.* at 49-50.

3

There are conflicting accounts of what happened next. There is video footage available from both a dashboard camera from one of the police cars in the "parade," as well as from a camera mounted on a light pole over the intersection near where the encounter took place. The overhead video shows Jackson and Jones engaged in a short conversation. Dkt. No. 48-6. There is no audio of this conversation available on any of the recordings, and the specific details of this interaction are disputed. In Jackson's deposition, he testifies that he cannot remember his interaction with Jones except that he told Jones he was just trying to join his friends on the north side of the street. Dkt. No. 55-6 at 41-50. Jackson states several times that he "can't recall" what the officers said to him. *Id.* For his part, Jones states that he instructed Jackson to return to the south side of the street, and Jackson continued to state that he wanted to join his party on the north side of the street. *Id.* at 66-67. The audio from the dashboard video reflects that the officer driving the patrol car instructed Jackson via the PA system to "stop arguing with the police and get back on the sidewalk." Dkt No. 48-4 at 2:26:41. At approximately this same time, Jones informed Jackson he was under arrest. Dkt. No. 55 at 67. According to the time stamp on the overhead video, only eleven seconds passed from the time Jackson bumped into Jones' bike to the time officers first grabbed Jackson's wrist. Dkt. No. 48-6 at 2:26:35–2:26:46. Presumably, Jones' statement informing Jackson he was under arrest took place slightly before the first officers grabbed Jackson's wrist.

In his deposition Jones states he "told Jackson he was under arrest and instructed Jackson to put his hands behind his back," but that Jackson did not comply. Dkt. No. 55-1 at 96-101. Jones states he then grabbed Jackson's right arm while Officer Huckaby, also a bicycle officer, grabbed his left, but that Jackson resisted their efforts to handcuff him by "stiffening his arms up and refused to allow me to put his hands behind his back." *Id.* Jones testified Jackson "attempted to pull away from our grasp" and that force was applied only after he was concerned that Jackson was about to

4

break free from the officers. *Id*. Huckaby also cites a concern that Jackson would break free as the reason he used force, stating that he applied knee strikes as an attempt to gain control of Jackson. Dkt. No. 48-3 at ¶ 8. In his affidavit, Huckaby states that he "continued to give Jackson verbal commands to put his hands behind his back, but Jackson did not comply with my commands." *Id*. Jackson disputes that he resisted the officers at all, and testified, "I just remember putting my—I figured I was getting arrested, because I was still standing there with all the police, and then when I put my hands behind my back they grabbed my hands. And then I just remember a lot of officers surrounding me in a circle, and I remember being hit in the face." Dkt. No. 55-6 at 42-43.

While the video evidence, and particularly the overhead video, shows the overall circumstances of the encounter, it is not fully dispositive of whose memory of the events is correct. It does not, however, fully corroborate the officers' claims. First, the video reflects that Jackson did not actively resist the officers. Dkt. No. 48-6 at 2:26:35–2:28:12. He does not pull his hands away, nor does he ever move toward the officers. *Id.* Instead, at most, he appears to be passively uncooperative. *Id.* Viewing the evidence in the light most favorable to Jackson, he may well have been surprised and confused, given how brief his interaction with the officers had been to that point, the street had not yet been closed, and there were many others still in, and crossing, the street in the immediate vicinity. *Id.* at 2:26:30–2:26:46. The video also reflects that the encounter escalated very quickly. In seconds, things went from Jackson talking to the officers, to him being surrounded by officers, and then to Huckaby and Jones almost immediately thereafter kneeing Jackson multiple times, while officers grab both of his arms. *Id.* at 2:26:35–2:26:54. Jackson stumbles backward, and one of the officers falls to his knees. *Id.* at 2:26:54–2:27:58. Jackson is grabbed again, then at least three officers and Jackson fall to the street, with the officers on top of Jackson. *Id.* at 2:26:58–2:27:05. A few seconds later, the video shows Jones delivering closed handed punches to

Jackson's head area, pausing, and then delivering several more punches to Jackson's head or face. *Id.* at 2:27:13–2:27:27. At the time these blows were delivered, there were three APD officers sitting on Jackson's legs, pelvis, and back, respectively. *Id.* Eventually, Jackson is handcuffed, and brought back to his feet. *Id.* at 2:27:55–2:28:12. After several minutes of patting him down, and other discussions, he is placed in a patrol car and taken to jail. *Id.* at 2:28:12–2:30:23.

At some point later that morning, a City of Austin magistrate signed off on an Affidavit for Warrant of Arrest and Detention, which charged Jackson with Failure to Comply with a Lawful Order and Resisting Arrest. Dkt. Nos. 48-8 and 48-9. Both charges were dismissed nearly a year later, on December 7, 2016. Dkt No. 55-10. Medical records show Jackson suffered a number of head injuries during the arrest, including a concussion, a facial fracture, cervical strain, and post-concussion syndrome. Dkt. No. 55-9 at 236, 277, 279, 317-320, and 336-338. Jackson testified that since that night, he has continued to suffer chronic headaches and back pain. Dkt. No. 55-9 at 116-118, 157-160, 190-192, and 238-242.

## IV. ANALYSIS

Jones and Huckaby move for summary judgment, contending that: (1) they did not violate Jackson's constitutional rights because (a) probable cause existed to arrest Jackson, and (b) they did not use excessive force, and, regardless, (2) they are entitled to qualified immunity. As is explained in more detail below, because the qualified immunity analysis includes determining whether the plaintiff has a triable case that the officer violated a statutory or constitutional right, the Court takes up all of the summary judgment arguments together, in the context of the qualified immunity discussion.

## A. Qualified Immunity

The doctrine of qualified immunity protects government officers from civil liability in their individual capacities if their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). Once raised as a defense, the plaintiff has the burden to demonstrate that qualified immunity should be pierced. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). This inquiry requires a two-part analysis, in which the court determines (1) whether the official violated a statutory or constitutional right, and (2) whether the unlawfulness of the official's conduct was "clearly established" at that time. *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). A right is "clearly established" only where pre-existing law "dictate[s], that is truly compel[s] (not just suggest[s] or allow[s] or raise[s] a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in these circumstances." *Sama v. Hannigan,* 669 F.3d 585, 591 (5th Cir. 2012). Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity unless "all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights." *Carroll v. Ellington*, 800 F. 3d 154, 169 (5th Cir. 2015). In the context of a summary judgment motion like the one here, to avoid summary judgment on the officers' claim of qualified immunity, the plaintiff must demonstrate that there is a genuine issue of material fact regarding whether a constitutional violation took place, and must show that clearly established law provided that the officer's conduct was objectively unreasonable. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir. 2007).

The Court has the discretion to decide the order in which to address the two qualified immunity inquiries. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In recent years, the vast

majority of courts have turned directly to the "clearly established' question to reach a conclusion on qualified immunity. *See Nerio v. Evans*, 2019 WL 2549225, at *5 (W.D. Tex. June 19, 2019). Because Jackson brings two constitutional claims—one for false arrest, and the other for excessive force—the Court will analyze the qualified immunity issue separately as to each claim.

1.   **Unlawful Arrest**

Jackson alleges Jones and Huckaby violated his Fourth Amendment rights when they arrested him without probable cause. An arrest is supported by probable cause where "the facts and circumstances within the officer's knowledge at the time of the arrest 'are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (citing *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004)). If multiple charges were filed, so long as there was probable cause for any of the charges, "the arrest was supported by probable cause, and the claim for false arrest fails." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). Even where an officer "reasonably but mistakenly believes that probable cause exists, he is entitled to qualified immunity." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013).

On his false arrest claim, Jackson has failed to meet his burden to pierce Defendants' qualified immunity defense. Jackson cannot point to any cases that existed at the time of his arrest with facts close to those here, holding that such an arrest violated the Fourth Amendment. This alone dooms the claim. *See Pearson*, 555 U.S. at 236 (holding the court has the discretion to decide the order in which to analyze the two-part qualified immunity inquiry, and the failure of either prong is fatal to the claim). Accordingly, the Court need not decide whether probable cause existed for Plaintiff's arrest. Even if the Court concluded that Defendants lacked probable cause and the arrest amounted to a violation of Plaintiff's Fourth Amendment rights, it does not appear that any of this

was "clearly established" at that time.³ As already discussed, to conclude a right was "clearly established" requires identifying a case "where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). Jackson has identified no such case, and the Court has not located one either. Accordingly, Defendants are entitled to summary judgment on their qualified immunity defense to this claim.⁴

### 2. Excessive Force⁵

Jackson asserts a § 1983 excessive force claim against Jones for punching Jackson numerous (up to ten) times in the head while Jackson was pinned to the ground. Dkt. No. 26 at ¶ 10, 16-20. Jones argues that, as a matter of law, the force he used was reasonable, and, regardless, he is entitled to qualified immunity. This means the Court must analyze whether Jackson has presented evidence of a violation of his rights and, if so, whether Jones had fair notice that his conduct violated Jackson's Fourth Amendment rights; that is, whether he had notice that the force he was using was constitutionally excessive. *See Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015).

---

³Moreover, were the Court to reach the merits of whether Jackson has established a fact question regarding his claim that the arrest was lacking in probable cause, it likely would conclude that he has failed to do so. It appears that there was probable cause for Jackson's arrest for failure to comply with a lawful order based on Jackson's own admissions that Jones instructed Jackson to return to the sidewalk and Jackson failed to comply. Dkt. 55 at 2. While Jackson spends a large portion of his briefing alleging Jones' command was unreasonable and racially motivated, Jackson never argues that the order was not given or that it was unlawful. *See id.* at 12-15. Failure to comply with a lawful order of a police office is a violation of the law. TEX. TRANS. CODE § 542.501; *Haggerty v. Tex. Southern Univ.*, 391 F.3d 653, 655-656 (5th Cir. 2004).

⁴Defendants also argue they are entitled to summary judgment on the unlawful arrest claim based on the fact a magistrate signed warrants for Jackson's arrest and independently determined that probable cause existed, thereby interrupting the chain of causation. Given the conclusions in the text, the Court need not reach this argument.

⁵Huckaby's motion seeks summary judgment on Jones' excessive force claim, though Jones did not sue Huckaby for excessive use of force. *See* Dkt. No. 26 at ¶¶ 16-21 (referring in every relevant place only to "Officer Jones"). Because there is no excessive force claim stated against Huckaby, the Court limits this portion of the order to an analysis of Jones' actions.

To establish a violation of his constitutional rights based on an officer's excessive use of force, a plaintiff must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 275 (5th Cir. 2015). Here, Jackson has adequately presented evidence of an injury resulting from Jones' use of force. *See* Dkt. No. 55-9 at 236, 277, 279, 317-320, and 336-338; *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) (merely "some injury" is sufficient). The Court thus turns to whether Jones' use of force was "clearly excessive" and "objectively unreasonable."

To assess whether force was clearly excessive and objectively unreasonable, the officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396-97 (1989). In *Graham v. Connor*, the Supreme Court identified three factors—the "*Graham* factors"—that courts should consider when assessing whether a particular use of force was reasonable: (1) the severity of the crime at hand, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. 490 U.S. at 389. Whether a use of force was excessive depends on the facts and circumstances of each particular case. *Id.* at 396.

Considering the instant case under the *Graham* factors, a jury could reasonably conclude the force used was excessive and thus constituted a violation of Jackson's constitutional rights. First, Jones initiated the arrest of Jackson based on his failure to comply with Jones' order to return to the sidewalk, a Class C misdemeanor. *See* TEX. TRANS. CODE § 542.501; TEX. PEN. CODE §12.23. This sort of crime— a Class C misdemeanor that is only punishable by a fine—militates against the use of force. *See Reyes v. Bridgwater*, 362 Fed.Appx. 403, 407 n.5 (5th Cir. 2010) (finding the

To establish a violation of his constitutional rights based on an officer's excessive use of force, a plaintiff must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 275 (5th Cir. 2015). Here, Jackson has adequately presented evidence of an injury resulting from Jones' use of force. *See* Dkt. No. 55-9 at 236, 277, 279, 317-320, and 336-338; *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) (merely "some injury" is sufficient). The Court thus turns to whether Jones' use of force was "clearly excessive" and "objectively unreasonable."

To assess whether force was clearly excessive and objectively unreasonable, the officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396-97 (1989). In *Graham v. Connor*, the Supreme Court identified three factors—the "*Graham* factors"—that courts should consider when assessing whether a particular use of force was reasonable: (1) the severity of the crime at hand, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. 490 U.S. at 389. Whether a use of force was excessive depends on the facts and circumstances of each particular case. *Id.* at 396.

Considering the instant case under the *Graham* factors, a jury could reasonably conclude the force used was excessive and thus constituted a violation of Jackson's constitutional rights. First, Jones initiated the arrest of Jackson based on his failure to comply with Jones' order to return to the sidewalk, a Class C misdemeanor. *See* TEX. TRANS. CODE § 542.501; TEX. PEN. CODE §12.23. This sort of crime— a Class C misdemeanor that is only punishable by a fine—militates against the use of force. *See Reyes v. Bridgwater*, 362 Fed.Appx. 403, 407 n.5 (5th Cir. 2010) (finding the

To establish a violation of his constitutional rights based on an officer's excessive use of force, a plaintiff must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 275 (5th Cir. 2015). Here, Jackson has adequately presented evidence of an injury resulting from Jones' use of force. *See* Dkt. No. 55-9 at 236, 277, 279, 317-320, and 336-338; *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) (merely "some injury" is sufficient). The Court thus turns to whether Jones' use of force was "clearly excessive" and "objectively unreasonable."

To assess whether force was clearly excessive and objectively unreasonable, the officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396-97 (1989). In *Graham v. Connor*, the Supreme Court identified three factors—the "*Graham* factors"—that courts should consider when assessing whether a particular use of force was reasonable: (1) the severity of the crime at hand, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. 490 U.S. at 389. Whether a use of force was excessive depends on the facts and circumstances of each particular case. *Id.* at 396.

Considering the instant case under the *Graham* factors, a jury could reasonably conclude the force used was excessive and thus constituted a violation of Jackson's constitutional rights. First, Jones initiated the arrest of Jackson based on his failure to comply with Jones' order to return to the sidewalk, a Class C misdemeanor. *See* TEX. TRANS. CODE § 542.501; TEX. PEN. CODE §12.23. This sort of crime— a Class C misdemeanor that is only punishable by a fine—militates against the use of force. *See Reyes v. Bridgwater*, 362 Fed.Appx. 403, 407 n.5 (5th Cir. 2010) (finding the

"severity" factor from *Graham* militated against a use of force where the alleged crime was a misdemeanor). Thus the first factor weighs against Jones.

Second, a fact issue exists as to whether Jackson posed an immediate threat to the safety of the officers or others. Jones asserts he was concerned because Jackson had not been searched for weapons. Dkt. No. 48-5 at ¶ 11. Yet, nothing in the record indicates Jones had any reason to believe Jackson was armed or dangerous. Instead, Jones' stated concern was the general, hypothetical concern that anyone an officer encounters might possess a weapon. The video shows that Jackson never put his hands in his pockets, reached for anything, or otherwise did anything suggesting he had, or was planning to use, a weapon. Dkt. No. 48-6 at 2:26:35–2:28:12. Viewing the facts in the light most favorable to Jackson, the Court cannot say that a reasonable officer would have perceived such a danger. Certainly, there is at least a fact question on that issue. The summary judgment evidence shows that Jackson had not been violent, was not screaming, and made no sudden movements or threatening actions. *See* Dkt. Nos. 48-4, 48-6, 48-10. Although Jackson failed to comply with Jones' order to return to the sidewalk, the Fifth Circuit has held that this alone does not constitute circumstances in which a reasonable officer would perceive a person as an "immediate threat." *See Ramirez*, 716 F.3d at 378 (holding that no reasonable officer could have concluded that the plaintiff posed a safety threat to the officers when the plaintiff questioned the officers' commands, did not comply with verbal orders, and then pulled away from an officer's grasp). Jones' testimony that he feared for the safety of the officers and others because he had not checked Jackson for weapons is insufficient to justify his use of force. *See Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017) (holding that "even accepting, for the sake of argument, that Officer Rogers might reasonably have feared Hanks had a concealed weapon," no reasonable officer would have perceived

an "immediate threat warranting a physical takedown" of a non-violent, non-fleeing suspect who "merely failed to comply with verbal instructions.").

Finally, under the third *Graham* factor, there is a fact question as to whether the force used was excessive to the need. First, fact questions exist regarding whether Jackson was resisting arrest or attempting to flee. Jackson has testified that he did not resist the officers' efforts. Dkt. No. 55-6 at 42-43. Jones on the other hand testifies that Jackson was resisting by stiffening his arm and balling up his hands. Dkt. No. 55-1 at 96-101. As noted, at this stage of the case, the Court must view the evidence in the light most favorable to Jackson, and the Court may not make credibility determinations. *Reeves*, 530 U.S. at 150. The videos of the arrest are not dispositive of either parties' recollections of the incident, thus they do not disprove Jackson's version of events and a reasonable jury could accept his version. *See Ramirez*, 716 F.3d at 374. As mentioned, it appears from the videos that Jackson was, at most, non-compliant with the officer's instructions, and passively resistant to the officers' attempts to take hold of his wrist. Dkt. Nos. 48-4, 48-6, and 48-10. Considering the video evidence, a jury could conclude that no reasonable officer would have perceived that Jackson was either actively resisting arrest, or attempting to flee, at least one of which would have been necessary to justify Jones' use of force. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) ("[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified."). Moreover the speed with which Jones went from discussing the situation with Jackson to using force also suggests summary judgment is inappropriate. The Fifth Circuit has noted that "several times [it has] found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell*, 868 F.3d at 342; *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016). Having considered the *Graham* factors, the Court

concludes that there are fact questions precluding summary judgment on the question of whether Jones violated Jackson's constitutional rights by his use of force in effecting the arrest.

The next question is therefore whether the unlawfulness of Jones' conduct was "clearly established" at that time. *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018). This requires determining whether, based on controlling case law at the time of the incident, Jones had fair notice that his actions were objectively unreasonable, based on the evidence viewed in the light most favorable to Jackson. *Mullenix,* 136 S. Ct. at 308. *See also Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (holding that at the summary judgment stage, a court cannot resolve fact disputes pertaining to either prong of qualified immunity in favor of the moving party).

Jackson's brief is extremely unhelpful on this issue. While he acknowledges that he must show that Jones violated one of Jackson's clearly established rights, he never cites a single case to demonstrate that Jones did so, and instead simply makes the bald claim that the arrest violated clearly established law. *See, e.g.,* Dkt. No. 55 at 9, 21. And though Jones correctly notes that the Court must determine if the relevant law was "clearly established," he too does not address the relevant precedents, but rather simply makes the claim that "Plaintiff can point to no cases that would have put . . . Jones on notice that every reasonable officer in their position would have concluded that the force they used on Jackson was excessive," (Dkt. No. 48 at 12).

In the vast majority of recent cases, this is the stage at which the plaintiff is unable to overcome the qualified immunity defense. As the undersigned recently noted, "since 2012, the Supreme Court has concluded in each of the 12 cases raising the issue that qualified immunity applied because the right at issue was not 'clearly established.'" *Nerio v. Evans*, 2019 WL 2549225 at *7 n.7 (W.D. Tex. June 19, 2019). The bar for demonstrating that a right is "clearly established"

13

has seemingly continued to rise every year, and is currently a very high bar. Again, quoting from the recent decision in *Nerio*,

> Under existing Supreme Court precedent, to conclude that a right was "clearly established" for qualified immunity purposes requires the existence of at least one circuit court case recognizing the right at issue based on a *very* similar factual scenario. As the Supreme Court has stated it, "[u]nder our cases, the clearly established right must be defined with specificity." *Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). In 2017, the Court stressed "the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). And in 2018, it said that "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S.Ct. at 589 (internal quotation marks and citations omitted).

*Id.* at *7. Because this burden is so high, most of the recent § 1983 cases have resulted in summary judgment for the state officer on this basis. Here, however, the case is different.

Specifically, the Fifth Circuit has held that "the law [at least as of January 2013] clearly established that it [i]s objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Trammell*, 868 F.3d at 341. The facts of *Trammell* are remarkably similar to those here, and thus warrant a full recitation. After relating the initial conversation between the officer and Trammell, during which Trammell complied with the officer's instruction to move away from his parked motorcycle, the circuit continues:

> Officer Fruge then asked Trammel, "Well, can you walk towards me?" Trammel declined and said, "No." Officer Fruge then commanded Trammel to place his hands behind his back. Trammel again told Officer Fruge, "I'm not answering your questions," and did not comply with Officer Fruge's request. At this point, Trammel took off the jacket he was wearing because he felt hot and said, "I'm not going to jail."

> At this point, Officer Fruge believed he had probable cause to arrest Trammel for public intoxication, and he grabbed Trammel's right arm as he told him to put his hands behind his back. Trammel immediately pulled back and told Officer Fruge that

14

> it hurt and not to grab him there. Officer Ingles then grabbed Trammel's left arm, but Trammel again pulled away. Officer Fruge executed a knee strike on Trammel's right thigh, and Trammel lost his balance. Officer Garza put Trammel in a headlock as he, Officer Neveu, and Officer Fruge pulled Trammel to the ground. Trammel states that he initially had his "arms in front of [his] body . . . [because he] was trying to prevent [his] fall," but that the officers were grabbing at his arms and landed on top of his body so that he landed face first on the pavement. Trammel claims that at some point when he was on the ground he "lost memory," but prior to this, he recalled a brief period of time where he could not breathe.
>
> While on the ground, the officers tried to grab hold of Trammel's arms, which were underneath him. The officers repeatedly asked Trammel to put his hands behind his back, and he apparently refused to comply. After the officers tackled Trammel, he can first be heard yelling that he is a cop, and later, as the officers command him to "stop resisting," Trammel can be repeatedly heard yelling that his arm is fused. During this time, the officers administered knee strikes to Trammel's arms, thighs, and ribs so that they could subdue and handcuff him.

*Trammell*, 868 F.3d at 337-38. As noted, the circuit in *Trammell* found that this use of force violated law that was clearly established at the time of that arrest, which took place on January 21, 2013, nearly three years before Jackson's arrest in this case. There is little doubt, therefore, that at the time of Jackson's arrest, it was clearly established that using the amount of force Jones used on Jackson was objectively unreasonable, and excessive. Just as in *Trammell*, Jackson was not attempting to flee, at most pulled his hand away when first grabbed, was kneed by two officers multiple times, was then tackled by multiple officers and when he landed his hands were pinned under him, and finally, was punched up to ten times while officers sat on top of him and attempted to get to his hands. Indeed, Jackson never even said anything suggesting a lack of cooperation, while Trammell told the officers "I'm not going to jail," making the use of force against Jackson even less warranted than in *Trammell*.

Other cases from the Fifth Circuit bolster this conclusion. For example, in *Hanks v. Rogers*, in addressing an arrest that took place in February 2013, the court held that an officer "violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing

15

verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Hanks*, 853 F.3d at 747. *See also, Ramirez*, 716 F.3d 369; *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000); *Garcia v. City of Buda*, 2018 WL 6682419, at *5 (W.D. Tex. Dec. 19, 2018) (officers were on notice that using force on a non-violent, non-fleeing plaintiff who demonstrated merely passive resistance was objectively unreasonable, rejecting the claim that *Carroll v. Ellington* —a case relied on by Jones—mandated a different conclusion).

In sum, there are fact questions precluding summary judgment on Jackson's excessive force claim against Jones. Jackson has demonstrated the existence of disputed facts regarding whether Jones violated Jackson's Fourth Amendment rights and has established that Jones was on notice that the force he used was excessive, viewing those disputed facts in the light most favorable to Jackson.

**B.      Gross Negligence or Willful and Wanton Misconduct**

As noted at the outset, in his response to the summary judgment motions, Jones abandoned most of his state law claims. He did not abandon, however, what he refers to in his Second Amended Complaint as a claim for "Gross Negligence or Willful or Wanton Misconduct." Dkt. No. 26 at 11, 12. He brings this claim against both Jones and Huckaby. *Id.* With regard to Jones, he bases the claim on three allegations: (1) Jones arrested him without probable cause; (2) Jones used excessive force during the arrest; and (3) Jones failed to address Jones' medical needs before placing him in detention. *Id.* at 11 ¶ 33. As to Huckaby, the claim is based solely on Huckaby allegedly arresting him without probable cause. *Id.* at 12 ¶ 38.

There is no federal cause of action for "gross negligence or willful and wanton misconduct," so presumably Jones brings these claims under state law. The entirety of the Defendants' argument as to why summary judgment should be granted on these claims is that "[f]or the reasons set forth

16

in the discussions of Jackson's claims for excessive force, false arrest and failure to provide medical attention, the actions of Jones and Huckaby were reasonable and supported by probable cause. As a result, any separate claims based on gross negligence or willful and wanton misconduct are without merit and should be dismissed." Jackson's response is similarly brief, and unhelpful. *See* Dkt. No. 55 at 24-25.

Jackson explicitly abandoned his claim regarding the failure of the officers to address his medical needs, so it would appear that he has likewise abandoned the portion of this claim arising out of the same allegation. Further, as discussed above, summary judgment is appropriate on Jackson's false arrest claim because there is no dispute of fact that there was probable cause to arrest Jackson for failing to obey a lawful order of a police officer. This is dispositive of Jones' gross negligence claim against Huckaby and Jones based on the alleged lack of probable cause for his arrest. All that remains of the gross negligence claim, therefore, is a claim against Jones based on the force he used in arresting Jackson. Jones' sole argument for summary judgment on this claim is his assertion that he had established as a matter of law that he did not use excessive force in arresting Jackson. As the Court has rejected that argument, summary judgment on the corollary gross negligence claim is unwarranted.

## IV. CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (Dkt. No. 48) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **DENIED** as to the claims against Jones for using excessive force in violation of § 1983, and for gross negligence or willful and wonton misconduct based on excessive force. The motion is **GRANTED** as to all other claims against Jones and Huckaby.

**FURTHER**, based on Jackson's voluntarily abandonment of the claim against the City of Austin, the City of Austin's Motion for Summary Judgment (Dkt. No. 49) is **GRANTED** and all claims against the City are **DISMISSED WITH PREJUDICE**.

Thus, the sole remaining claims for trial are two claims against Officer Jones: (1) a § 1983 claim of excessive force; and (2) a gross negligence or willful and wanton misconduct claim based on the use of excessive force.

**SIGNED** this 11th day of October, 2019.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE